IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JEFFERY KING, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 17 C 8712 |
| v. ) | |
| ) | Magistrate Judge Jeffrey Cole |
| NANCY A. BERRYHILL, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Jeffery King seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying his May 30, 2014 application for Disability Insurance Benefits ("DBI") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 416(I), 423, 1382c(3)(A). (Administrative Record (R.), 240-52). Mr. King claims that he became disabled on May 13, 2014 due to back pain, bronchial asthma, and high blood pressure. (R. 71, 79-80, 240). His claim was denied both at the initial and reconsideration stages, and on October 31, 2016, an Administrative Law Judge ("ALJ") concluded that Mr. King was not disabled. After the Appeals Council denied review, Mr. King filed suit under 42 U.S.C. § 405(g), and the parties consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c). Mr. King asks the court to reverse the ALJ's decision and to remand it to the Commissioner for further review. The Commissioner has filed a cross-motion seeking to uphold the ALJ's finding.

**I.**

Mr. King stopped working in 2008 as a driver of trucks that load or unload trains. (R. 73). He claims that back pain made it impossible to continue with his work after 2008, though

Mr. King did not seek treatment for his pain until June 2014. (R. 396-97, 430-31). An x-ray showed lumbar spondylosis with moderate disc space narrowing. (R. 453). In September 2014, an orthopedic surgeon diagnosed Mr. King with severe lumbar degeneration, decreased spinal motion, lower-extremity radiculopathy, and possible claudication from spondylosis. (R. 520). The physician recommended a course of therapy. By October 2014, Mr. King again sought treatment for right-arm numbness and decreased strength and was diagnosed with a condition consistent with bilateral impingement syndrome in his shoulders. (R. 510). He was again referred to a course of physical therapy. Then in May 2015, Mr. King began treatment with primary care physician Dr. Prince Hodogbey. Dr. Hodogbey noted that Mr. King was experiencing low back pain with sciatica and referred him to additional physical therapy, which Mr. King underwent from July to October 2015. (R. 746-61, 785-97). A final round of therapy then began in May 2016, when Mr. King presented with an impaired gait, decreased range of motion, impaired balance, and a decrease in his ability to tolerate activities. (R. 764-67).

Mr. King appeared at an administrative hearing on August 4, 2016. He told the ALJ that therapy helped to alleviate his pain for short periods of time. As time went on – sometimes even during the course of one day – the pain returned. (R. 83). Prescription doses of 800 mg. of ibuprofen help to relieve his discomfort. Mr. King described his pain as ten on a scale of one-to-ten without medication, but as five to six with ibuprofen. (R. 84). Back and leg pain also restrict the activities that Mr. King can undertake. He claimed that he had been prescribed a cane by one of his physicians and that he could walk one to two blocks with the help of his cane and medication; he can only walk a half block without the cane. (R. 84). Mr. King can stand for ten to 20 minutes with the cane but only for five minutes without it. (R. 86). He does few household chores. Mr. King told the ALJ that he makes breakfast, sometimes walks his

granddaughter to school, and occasionally attends church. (R. 88). Mr. King testified that these activities involve restricted effort. His granddaughter's school is "right across the alley" from his home, and at church he needs to stand and move around after sitting for 20 minutes. (R. 88, 90).

The ALJ found that Mr. King suffers from two severe impairments, chronic obstructive pulmonary disease and spondylosis of the lumbar spine. (R. 51). Mr. King challenges the ALJ's findings concerning the second disorder. Neither disorder met or medically equaled an impairment assumed to be disabling in the Commissioner's listings. (R. 54-55). 20 C.F.R. Pt. 404, Subpart P., App. 1. The ALJ found that Mr. King's statements concerning the severity and frequency of his impairment-related symptoms were "not entirely consistent" with the medical evidence contained in the administrative record. (R. 57). The ALJ concluded, for example, that no physician had ever prescribed a cane to Mr. King; that his prescribed course of treatment had never included surgery or opioid pain medications; that no evidence supports claims of shoulder restrictions; and that Mr. King did not file for disability benefits until 2014, even though he stopped working in 2008. (R. 57-58).

Part of the ALJ's analysis concerned the appropriate weight to assign to the reports of two medical experts. Mr. King's treating physician Dr. Hodogbey submitted his assessment of Mr. King's condition on June 15, 2016. Dr. Hodogbey thought that Mr. King would be able to lift 20 pounds occasionally and ten pounds frequently and would require a sit/stand option. (R. 775). Mr. King would also be restricted to frequent use of his upper extremities to reach overhead. (R. 776). He would be off task 15 percent of the time and would need to be absent from work at least four days a month. (R. 775). The ALJ gave little weight to Dr. Hodogbey's report. (R. 59). By contrast, the ALJ assigned great weight to the March 20, 2015 report of the

state-agency expert Dr. Lenore Gonzalez. Like Dr. Hodogbey, Dr. Gonzalez thought that Mr. King could lift 20 pounds occasionally and ten pounds frequently. He could sit for six hours during a normal workday and stand or walk for six hours. Unlike Dr. Hodogbey, Dr. Gonzalez did not believe that Mr. King would require a sit/stand option and did not believe that Mr. King would have any restrictions on the use of his upper extremities, other than the lifting limitations of ten pounds frequently and 20 pounds occasionally. (R. 118-128).

Based on these assessments, the ALJ found that Mr. King had the residual functional capacity ("RFC") to carry out light work as it is defined in the regulations, with occasional climbing of ladders, ropes, or scaffolds. 20 C.F.R. § 404.1567(b). Relying on the testimony of a vocational expert ("VE"), the ALJ found that Mr. King could perform his past relevant work based on this RFC: a truck "spotter" as defined under No. 910.683-101 in the *Dictionary of Occupational Titles* ("DOT"). (R. 60). Accordingly, the ALJ concluded that Mr. King was not disabled.

## II.

If the ALJ's decision is supported by substantial evidence, the court must uphold that decision even if it might have decided the case differently in the first instance. *See* 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Beardsley v. Colvin*, 758 F.3d 834, 836 (7th Cir. 2014). To determine whether substantial evidence exists, the court reviews the record as a whole, but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Id*. at 837. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict. *Binion v.*

*Chater*, 108 F.3d 780, 782 (7th Cir. 1997); *Schloesser v. Berryhill*, 870 F.3d 712, 717 (7th Cir. 2017).

In the Seventh Circuit, an ALJ has an obligation to create what Judge Posner called a "logical bridge" between the evidence and the result in order to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015). However, as occurs so often where catch phrases are involved, the phrase, "logical bridge" has for some taken on a life of its own as though it were some self-defining and exacting test. Of course, it is no such thing, and it was never intended to be a substitute for analysis or require that an ALJ's decision be viewed grudgingly. Indeed, Judge Posner, who first used the phrase in a Social Security context in *Sarchet v. Chater*, 78 F.3d 305 (7th Cir. 1996) would be the first to acknowledge that it was not meant as a self-defining test or formula. *Cf., United States v. Edwards,* 581 F.3d 604, 608 (7th Cir.2009)("We recall Holmes's admonition to think things not words...); *Peaceable Planet, Inc. v. Ty, Inc.,* 362 F.3d 986, 990 (7th Cir.2004).

The phrase "logical bridge," seems to have first appeared in *Thompson v. Clifford*, 408 F.2d 154,167 (D.C. Cir. 1968), where Judge Spottswood Robinson said in a case not involving Social Security: "'Administrative determinations must have a basis in law' and their force depends heavily on the validity of the reasoning in the logical bridge between statute and regulation." *Sarchet* utilized the phrase in Social Security contexts and required that the ALJ articulate reasons for accepting or rejecting entire lines of evidence. Although a written evaluation of each piece of evidence or testimony is not required, neither may the ALJ select and discuss only that evidence that favors his ultimate conclusion. *Mason v. Colvin*, No. 13 C 2993, 2014 WL 5475480, at *5 (N.D. Ill. Oct. 29, 2014). The point Judge Posner sought to make in *Sarchet* was that unexplained conclusions by Administrative Law Judges are not persuasive.

The reviewing court must be able to trace the path of the ALJ's reasoning from the evidence to the conclusion. Even if the court agrees with the result, the case must be remanded if the ALJ fails in his or her obligation to build the required analytical bridge. As the court put it in *Sarche*t, "we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." 78 F.3d at 307. Thus, the logical bridge" requirement is not about *elegantia jurisdiction or* aesthetics. The ALJ need not build the Pont Neuf. All that is necessary is that the reviewing court be able to traverse the analytical route the ALJ explained he from the evidence to the conclusions. The ALJ's explanations in this case do not withstand scrutiny.

## III.

Mr. King challenges the ALJ's decision on three grounds. He argues that (1) substantial evidence does not support the ALJ's assignment of little weight to Dr. Hodogbey's report; (2) the ALJ improperly evaluated Mr. King's statements concerning his symptoms; and (3) the ALJ erred at Step Four by failing to compare Mr. King's exertional capacity to the demands of his past work.

### A. The Expert Report

An ALJ is required to evaluate every medical opinion in the record. 20 C.F.R. § 404.1527(d). The opinion of a treating doctor like Dr. Hodogbey merits particular consideration because a "treating physician's opinion is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010). If a treating

doctor's report is not given controlling weight, an ALJ must decide what weight to assign to it. *See Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010). The regulations lay out six factors that an ALJ should consider as part of this analysis, including the nature and length of the treatment relationship, the medical expert's specialization, and the degree to which a source's opinion is supported by other evidence. 20 C.F.R. § 404.1527(d)(1)-(6). Although the guidelines regarding medical opinion evidence have changed, this standard applies when, as here, a claim was filed prior to March 27, 2017. 20 C.F.R. § 404.1520c(a) (2017).

The ALJ gave two reasons why he assigned little weight to Dr. Hodogbey's report. First, he criticized the report's findings because they do not contain a "function-by-function explanation" of how Mr. King's impairments gave rise to his limitations. (R. 59). The ALJ had no ground for making such an objection. It is well-established that a treating physician is not required "to provide a function-by-function analysis" or explanation of what a claimant can do. *See, e.g., Colson v. Colvin*, 120 F. Supp.3d 778, 792 (N.D. Ill. 2015); *Kimak v. Colvin*, 2014 WL 1758638, at *8 (N.D. Ill. 2014) ("the regulations do not require a treating physician to base his opinion on a function-by function assessment"). That said, Dr. Hodogbey's report was far from summary. He specified the weights that Mr. King could lift and carry; his ability to sit, stand, and walk; the need for a sit/stand option; the use of his arms, hands, and feet; and detailed descriptions of postural and environmental restrictions. (R. 774-77).

Second, the ALJ thought that Dr. Hodogbey's findings exceeded the limitations that the objective record could support. It is not clear what exact range of restrictions the ALJ meant by this claim because he only identified one: Dr. Hodogbey's finding that Mr. King could only use his upper arms to reach overhead frequently. (R. 59, 776). The ALJ doubted that a shoulder restriction was present because he did not think any evidence of a shoulder impairment existed.

7

The record, however, clearly contradicts such a claim. Mr. King sought treatment for shoulder pain on November 21, 2014, when Dr. Angelica Gierut found that Mr. King's discomfort was compatible with a bilateral impingement syndrome "likely due to supraspinatus tendinosis or partial thickness tear." (R. 510). She prescribed physical therapy, which Mr. King underwent. A medical entry dated six weeks later on January 5, 2015, reiterates that Mr. King was diagnosed with an impingement syndrome in his shoulders. (R. 505). The ALJ further stated in another part of his decision that Mr. King did not show any decreased muscle strength or atrophy. (R. 59). That, too, is inaccurate, at least insofar as it concerns Mr. King's shoulders. On December 3, 2014, Mr. King's physical therapist noted "severe peri-scapular muscular weakness." (R. 683).

The Commissioner argues that the ALJ's oversight of these facts does not merit remand because his assessment was based on the expert report as a whole, not just on Mr. King's shoulder functioning. In reality, the ALJ could not have weighed the report as a whole without contradicting his own RFC assessment and the reasoning that supports it. That is because some of Dr. Hodogbey's most important conclusions agree with what the ALJ said that Mr. King could do. Like the ALJ, Dr. Hodogbey thought that he could carry out light work by lifting 20 pounds occasionally and ten pounds frequently. (R. 775). Dr. Hodogbey also agreed with the ALJ that Mr. King did not need a cane to ambulate. (R. 775). He even thought that Mr. King was less restricted in some ways than the ALJ said he was: Dr. Hodogbey concluded that Mr. King could sit for eight hours a day; the ALJ limited him to six hours of sitting each day. (R. 55, 775). Without accounting for this important overlap, the ALJ could not dismiss Dr. Hodogbey's report as a whole without contradicting his own finding that Mr. King could perform light work and that the record supported that exertional restriction. The ALJ would also have contradicted

8

his assignment of great weight to the report of the state-agency expert, Dr. Lenore Gonzalez, which also stated that Mr. King could carry out light work. Yet the ALJ gave no indication that he considered Dr. Hodogbey's findings on these issues, or that he was aware of what Dr. Hodogbey had said. *See McMurtry v. Astrue*, 749 F. Supp.2d 875, 888 (E.D. Wis. 2010) (explaining that an ALJ can give different weights to different findings in a treating physician's report).

The ALJ accorded little weight to the expert report of Dr. Hodogbey because of what he viewed as contradictions between Dr. Hodogbey's findings and his treatment notes. Unfortunately, he pointed to none. The fact that Dr. Hodogeby's expert report did not cite his treatment notes to support Mr. King's restrictions is hardly conclusive or even meaningful. While an ALJ may appropriately discount an expert opinion when it *conflicts* with the physician's treatment notes, *Schmidt v. Astrue*, 496 F.3d 833, 842-43 (7th Cir. 2007), the regulations do not require a treating physician to cite as support his or her own notes in an expert report, as the ALJ seems to have incorrectly assumed. *See* 20 C.F.R. § 404.1527(c)(3).[1]

The ALJ also stated in broad terms that Dr. Hodogbey's notes did not support the report's conclusions. It is not clear what it was that troubled the ALJ on this issue, as he did not specifically cite any of Dr. Hodogbey's treatment notes as part of his evaluation of the expert report. He did cite two notes in other parts of the decision, but neither explains the basis of the ALJ's reasoning. One refers to Mr. King's asthma, which the ALJ did not suggest was relevant to his criticism of Dr. Hodogbey's report. (R. 55). Indeed, the report itself explains that Mr. King's limitations stem primarily from back pain, not asthma. (R. 776). The second note states that Dr. Hodogbey diagnosed Mr. King with low back pain in April 2016 and referred him to

---

[1] The presence of a conflict between the notes and the report would be analytically equivalent to a prior inconsistent statement, which is significant in determining credibility.

physical therapy. (R. 53). The ALJ, however, gave no explanation of why he thought that contradicted Dr. Hodogbey's findings about Mr. King's back-related restrictions. Yet, "the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001).

The record shows, for instance, that Mr. King presented for physical therapy on May 11, 2016 – one month prior to the June 2016 expert report – when he was assessed as being 40 percent disabled. His therapist set Mr. King's short-term goals as the relatively minimal ability to stand for 30 minutes and walk at least four city blocks after receiving four weeks of therapy. (R. 767). The ALJ overlooked these findings. If the ALJ believed these therapy evaluations of Mr. King's restrictions were inconsistent with Dr. Hodogbey's report and treatment notes, then he was obligated to cite them and to explain the basis of his reasoning. That is the essence of the logical bridge requirement. *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) ("In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review."); *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) ("[P]rinciples of administrative law require the ALJ to rationally articulate the grounds of her decision and confine our review to the reasons supplied by the ALJ.").

The ALJ never explained what led him to reject Dr. Hodogbey's most serious limitations. The expert report states that Mr. King would need to be off task up to 15 percent of the time, would be absent from work for four or more days each month, and required a sit/stand option. (R. 774-75). The VE told the ALJ at the administrative hearing that the combination of these restrictions would prevent Mr. King from engaging in competitive work. (R. 99). That made it incumbent upon the ALJ to explain what it was that led him to reject Dr. Hodogbey's findings.

*See Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000) ("the ALJ's failure to address [an expert] report in its entirety prevents this court form tracking the ALJ's reasons for discounting it"). Remand is therefore necessary so that the ALJ can more carefully explain his reasons for the weight assigned to Dr. Hodogbey's expert report.

    B.    **The Symptom Analysis**

If an ALJ finds that a medical impairment exists that could be expected to produce a claimant's alleged condition, the ALJ must then assess how the individual's symptoms affect his or her ability to work. SSR 16-3p. Factors that should be considered include the objective medical evidence, the claimant's daily activities, allegations of pain, any aggravating factors, the types of treatment received, any medications taken, and functional limitations. *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006); 20 C.F.R. § 404.1529(c)(3). A court reviews an ALJ's decision with deference and overturns it only when the assessment is patently wrong. *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010). The ALJ must support the conclusion with evidence. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ discounted Mr. King's statements about his impairment-related symptoms, in part, because six years elapsed between the time he stopped working in 2008 and his 2014 application for disability benefits. The ALJ also noted that Mr. King did not testify that he was unable to perform all jobs regardless of exertional requirements; he only stated that he could no longer carry out his prior work as a truck driver. (R. 58). That led the ALJ to speculate that Mr. King may have misunderstood that the regulations require him to be unable to perform any sustained work. (R. 58-59). Neither of these reasons supports the ALJ's evaluation of Mr. King's statements. Mr. King's understanding of disability law does not determine how his specific claims about his impairment-related symptoms should be evaluated. If the ALJ thought

that it was relevant to the symptom analysis, he should have asked Mr. King to explain his position at the hearing instead of speculating about what kind of jobs Mr. King thought the law requires him to be unable to do. The fact that Mr. King filed for disability benefits six years after he stopped working in 2008 is irrelevant to such an analysis; Mr. King claims that he became disabled on May 13, 2014, not in 2008. (R. 51). The ALJ's task was to evaluate the severity of Mr. King's symptoms starting on that date by applying the factors set out in SSR 16-3p.

The ALJ began his analysis by discussing Mr. King's activities of daily living ("ADLs"). He noted that Mr. King stated that he can boil an egg for breakfast; care for his grandchild and walk her to school "across the alley from his home;" shop online; and attend church, but that he has to move around after sitting for only 20 minutes. (R. 57). It is unclear what role these minimal activities played in the ALJ's analysis, or how he went about evaluating them. Certainly, the ALJ could not have thought that Mr. King's ADLs supported his analysis. There is no obvious link, for example, between being able to boil an egg and the capacity to perform light work for 40 hours each week. Nor does Mr. King's ability to walk his granddaughter across an alley support the ALJ's finding that he can stand and/or walk for six hours each workday. Indeed, Mr. King's claim that he had to walk during church services after sitting for 20 minutes reinforces Dr. Hodogbey's belief that he required a sit/stand option. But the ALJ never directly evaluated any of Mr. King's activities. Nor did he explain what might have undermined Mr. King's testimony other than to provide a general review of the record without tying any part of it to Mr. King's described activities. Courts have repeatedly instructed ALJs that, without more, such evidentiary summaries are not adequate to support a symptom analysis or an RFC assessment. *See*, *e.g.*, *Larson v. Colvin*, 26 F. Supp.3d 798, 811 (N.D. Ill. 2014)

("[The ALJ] could not simply summarize the evidence and say it didn't support Mr. Larson's allegations. Just as an expert's *ipse dixit* is not acceptable . . . neither is an ALJ's. That is the whole point of the logical bridge requirement."); *Elmalech v. Berryhill*, No. 17 C 8606, 2018 WL 4616289, at *10 (N.D. Ill. Sept. 26, 2018); *Broadnax v. Berryhill*, No. 16 C 9239, 2016 WL 6804583, at *6 (N.D. Ill. Nov. 17, 2016).

The ALJ's primary focus was on Mr. King's testimony that he uses a cane and that a doctor had prescribed one to him at some point in 2015. The ALJ faulted Mr. King because the record does not contain a copy of the prescription he claims he received. (R. 81). However, the fact that a doctor may not have issued a prescription for an ambulatory device is not necessarily a sufficient or independent ground for rejecting a claimant's statements about his mobility. *Cf., Berry v. Chicago Transit Authority*, 618 F.3d 688, 618 F.3d 688 (7th Cir. 2010). After all, even a *United States v. Saunders*, 973 F.2d 1354, 1360 (7th Cir. 1992). *See also, Stahl v. Colvin*, 632 Fed.Appx. 853, 860 (7th Cir. 2015) ("Although it appears that no doctor ever prescribed crutches for [claimant], no prescription is necessary; crutches can be bought by anyone who wants them.").

The more relevant question is then whether Mr. King actually needed a cane and how frequently he uses it. The ALJ thought that Mr. King *implied* that he always needs to use one. (R. 57). The Commissioner goes even farther by stating that Mr. King specifically testified that he relies on one at all times. Neither claim is accurate. Mr. King stated that he uses an assistive device and that he is able to walk farther, and stand for longer periods of time, with it. (R. 84-86). He never testified or necessarily implied that he uses one at all times.

The ALJ also thought that Mr. King's physical therapy reports cast doubt on his need for a cane. The ALJ claimed that a May 11, 2016 evaluation suggested that Mr. King said he always

13

needed an assistive device, but that the therapist did not document that Mr. King actually used one. (R. 58). The record in question contradicts both of the ALJ's points. Contrary to the ALJ's claim, the May 11, 2016 therapy report states that Mr. King was using a straight cane when he appeared for treatment; it contains no suggestion that he told the therapist that he needed to use it at all times. (R. 764). The ALJ was also troubled because the therapist did not document that Mr. King really needed to use the cane and did not state that he required help to move without it. (R. 58). The ALJ was correct in stating that the May 11, 2016 treatment note does not state that Mr. King needed help in walking. The problem with that, however, is that the ALJ did not cite the May 2016 note to support his point; he referred instead to a September 10, 2014 note entered 18 months earlier. (R. 1016). Ironically, that note contradicts the ALJ's underlying point, stating that Mr. King required just the kind of physical help to walk without a cane that the ALJ said he did not need. (R. 1016, "Physical Assistance Needed: CGA [contact guard assistance] for safety when ambulating without assistive device"). An ALJ obviously cannot sustain a credibility analysis based on "errors of fact or logic," *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006), on "incorrect information or illogical reasoning." *Heldenbrand v. Chater*, 132 F.3d 36 (7th Cir. 1997). *See also Sarchet* 78 F.3d at 307. Yet, that is precisely what occurred here.

The ALJ further discounted Mr. King's testimony because he had only received conservative treatment and did not require more aggressive modalities such as surgery. Rather, Mr. King was treated primarily with prescription-strength ibuprofen and physical therapy. *See Olsen v. Colvin*, 551 Fed.Appx. 868, 875 (7th Cir. 2014) (finding that steroid injections and therapy recommendations constitute conservative treatment). The ALJ noted that Mr. King's need for a cane had been significantly reduced in 2014 after only two weeks of therapy and that

he testified that he "always feels great" after a therapy session. (R. 56, 58). The fact that his treatment was conservative, however, does not necessarily mean that Mr. King mischaracterized his symptoms. The appropriate consideration is the degree to which Mr. King's treatment alleviated his condition. *See Dyer v. Berryhill*, 237 F. Supp.3d 772, 776 (N.D. Ill. 2017). While Mr. King told the ALJ that he felt good after therapy sessions, he also testified that the pain quickly returned "even in the course of a day." (R. 83). Moreover, the ALJ never considered that, while therapy sometimes improved Mr. King's condition, he required repeated referrals to a physical therapist when his symptoms became worse. Mr. King began therapy in September 2014, when his pain was five out of ten, he had less than a 25 percent ability to do heel and toe walking, and he was considered 54 percent disabled on the Oswestry Disability Scale. (R. 643-44). By October 31, 2014, he was 42 percent disabled and no longer needed to use a cane, though his pain levels remained the same. (R. 675). Mr. King again entered therapy for back pain on July 29, 2015. His Oswestry score showed 60 percent disability, he occasionally needed a cane, and he had poor lifting mechanics. (R. 749). Mr. King showed "minimal progress" upon release from therapy on October 14, 2015. (R. 762). A new round of therapy started in May 2016, when Mr. King's pain level was eight out of ten and had worsened over the past six months. (R. 764).

Even though therapy constitutes a conservative form of treatment, Mr. King's continued need for it, combined with no evidence that he reached a stage of lasting recovery, should have given the ALJ pause before construing it against Mr. King's description of his symptoms. The record strongly suggests that Mr. King's condition fluctuated over time. SSR 16-3p requires an ALJ to take that into account. *See* SSR 16-3p ("Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time."). Yet the ALJ did not

examine the fluctuating nature of Mr. King's condition and provided no explanation of why he would be able to undertake full-time work in light of it. That includes what appears to be Mr. King's periodic use of a cane. The Ruling also instructs ALJs to consider the consistency of a claimant's statements about his condition. *See* SSR 16-3p ("[W]e will compare statements an individual makes in connection with the individual's claim for disability benefits with any existing statements the individual made under other circumstances."). The ALJ failed to note that Mr. King's statements about his pain were consistent with what he told his therapist. Mr. King explained to the therapist that his pain had worsened during the last six months, that he could only walk for two blocks, and that his pain increases after sitting more than one hour or standing more than 15 minutes. (R. 764). That is also largely consistent with what he told the ALJ. (R. 84-86).

In addition, Mr. King's therapy goals were remarkably limited; his therapist hoped that he would be able to walk four blocks without pain and stand for 30 minutes without needing to sit. (R. 767). Even if Mr. King had met those goals (and the record does not show that he did), they would have been inconsistent with the ALJ's finding that Mr. King could walk and/or stand for six hours a day without the sit/stand option that Dr. Hodogbey said he needed. Without accounting for this aspect of the treatment record, the ALJ failed to draw any bridge between Mr. King's need for physical therapy and the ALJ's conclusion that his symptom testimony was inconsistent with the medical record.

**C.  Step Four**

Finally, Mr. King argues that the ALJ erred at Step Four by finding that he could perform his past relevant work as a train "spotter." The ALJ noted that the VE had identified that job as DOT No. 910.683-010 and testified that it involved semi-skilled work that required a light

16

exertional level. Mr. King claims that the ALJ erred by not comparing the job duties required by his past relevant work with the abilities that the ALJ thought that Mr. King still had. He also claims that the VE failed to identify the correct DOT entry for a train spotter.

At Step Four, an ALJ "must specify the duties involved in a prior job and assess the claimant's ability to perform specific tasks". *Nolen v. Sullivan*, 939 F.2d 516, 519 (7th Cir. 1991). An ALJ cannot merely cite the exertional level of a claimant's past work. Rather, an ALJ must address whether the claimant "could perform the duties of the specific jobs that she had held." *Smith v. Barnhart*, 388 F.3d 251, 253 (7th Cir. 2004). The ALJ in this case did not do so. He identified the job by DOT number, said that it required light work, and stated that the specific vocational preparation level for the job as four. (R. 60). Even if the ALJ had compared the job's duties with Mr. King's abilities, DOT No. 910.683-010 does not appear to identify the work that Mr. King performed. He testified that he drove automatic trucks to various places in train yards based on requests requested from his supervisors. (R. 73-75). By contrast, DOT No. 910.683-010 describes a hostler, who drives locomotives to the railroad roundhouse for cleaning or repair and then returns the trains to the engine crew. Mr. King argues that the ALJ's reliance on DOT No. 910.683-010 requires remand. The court need not address that issue because the Commissioner has not responded to it, and thus has waived any argument that might have been raised. *Nichols v. Mich. City Plant Planning Dept.*, 755 F.3d 594, 600 (7th Cir. 2014).

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for remand [Dkt. #14] is GRANTED, and the defendant's motion for an affirmance of the ALJ's decision [Dkt. #21] is DENIED.

ENTERED: /s/ Jeffrey Cole
UNITED STATES MAGISTRATE JUDGE

**DATE:** 11/27/18